## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF KENTUCKY
### COVINGTON DIVISION

IN RE

**KENNETH L. BIERY**                                          **CASE NO. 10-23338**
**SANDRA K. BIERY**
**DEBTORS**

## MEMORANDUM OPINION AND ORDER GRANTING, IN PART, DEBTORS' MOTION FOR CLASS CERTIFICATION

Debtors Kenneth and Sandra Biery ("Debtors") received a Chapter 7 discharge shortly after filing bankruptcy. That discharge extinguished their personal liability on their home mortgage, and enjoined Debtors' mortgagee, Beneficial Kentucky, Inc. ("Beneficial"), and mortgage servicer, HSBC Mortgage Services, Inc. ("HSBC" and collectively with Beneficial, "Respondents"), from collecting the debt as a personal liability. Debtors' bankruptcy did not, however, extinguish Beneficial's mortgage, or alter Beneficial's in rem right to foreclose in the event that Debtors defaulted on their discharged debt. More than a year after Debtors' discharge, Beneficial filed a foreclosure action.

Respondents, however, did not confine themselves to pursuing their in rem rights after Debtors' discharge. They also sent Debtors a series of statements both before and after the filing of the foreclosure action. Many of these statements contained disclaimers that acknowledged the discharge of Debtors' personal liability, but reminded Debtors of the continued existence of Beneficial's lien and advised Debtors of the amounts of voluntary payments required to avoid default ("Informational Statements"). Other statements, however, contained no such disclaimers and were identical to the billing statements Beneficial and HSBC send to customers who have not received discharges in bankruptcy ("Billing Statements").[1]

---

[1] Until they filed their reply brief in response to Respondents' opposition to class certification, Debtors did not provide a definition of "regular billing statement" or "informational statement," other than to refer the Court to

Debtors believe that both types of statements violate their discharge injunction and have moved to hold Respondents in contempt.  They further seek to represent two subclasses of discharged chapter 7 debtors in this District with similar contempt claims for discharge violations against Respondents:  (1) debtors who received Billing Statements post-discharge, and (2) debtors who received Informational Statements post-discharge.

For the reasons set forth below, the Court concludes that class treatment is inappropriate for the claims of debtors who received Informational Statements, but is appropriate for the claims of debtors who received regular Billing Statements.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  The Debtors' Bankruptcy.

In 2007, Debtors refinanced their home mortgage with Beneficial.  The new mortgage was secured by a lien on Debtors' then home in Erlanger, Kentucky (the "Erlanger property").  In September 2010, Debtors moved out of that residence to an apartment in Walton, Kentucky, where they currently reside.  Three months later, on December 22, 2010, Debtors filed a voluntary chapter 7 petition for bankruptcy.

Debtors' petition scheduled the mortgage debt to Beneficial and, as required by the Bankruptcy Code, stated Debtors' intention to surrender the Erlanger property securing that debt.  *See* 11 U.S.C. § 521(a)(2)(A) (requiring that chapter 7 debtors state, with respect to estate property securing scheduled debts, whether they intend to retain or surrender the property and, if applicable, whether they intend to redeem the property or reaffirm the debt securing it).  Respondents contend that instead of surrendering the property, Debtors initiated loan modification negotiations that were ultimately unsuccessful.

---

certain exemplar billing statements and informational statements, and to refer to statements with prominent disclaimers as "informational statements" and statements without prominent disclaimers as "regular billing statements."  *See* discussion *infra* Section I.C.3.

On May 3, 2011, Debtors received a discharge under 11 U.S.C. § 727.  At discharge, they

remained the title owners of the Erlanger property.  The parties agree that the discharge

extinguished Debtors' personal liability to Beneficial.  Respondents received a copy of Debtors'

discharge on May 11, 2011.

**B.  Respondents' Post-Discharge Communications with Debtors.**

Four months after Debtors' discharge, in what Respondents describe as an inadvertent

error, one of HSBC's account representatives changed the mail code (a single-digit code in

HSBC's accounting software that controls what kind of mail a customer receives) in Debtors'

account to "0."  The number "0" is the code in HSBC's system for non-bankruptcy customers

and triggers the automated production of monthly regular Billing Statements.

Accordingly, beginning in September 2011, Debtors began to receive Billing Statements

identical to those received by Respondents' non-bankruptcy customers.[2]  [*See* ECF Nos. 148-1

to -3.]  These statements listed "payment due," "Balances Owed," "Past Due Amount[s]," and a

"Payment Due Date."  They advised that to "avoid late charges we must receive your payment

by" a date certain.  They contained a payment coupon with which to make payments and

contained the following "Account Notice": "Your account is now seriously overdue.  We expect

you to pay the past due amount immediately."  Debtors never sent payments in response to these

statements, or to any other post-discharge statements they received from Respondents.

Respondents claim that Debtors initiated conversations with Respondents about deeding

the Erlanger property to Respondents in lieu of foreclosure in October 2011.  Debtors deny that

they made a deed-in-lieu offer.  The record shows that in May 2012, HSBC sent deed-in-lieu

documents to the Debtors, Debtors' bankruptcy attorney subsequently requested a change in the

language of the deed, and on May 21, 2012, HSBC sent a letter to the Debtors informing them

---

[2] Each of the Billing Statements or Informational Statements that Debtors received is attached to the parties' joint
stipulations with respect to Debtors' motion for class certification.  [*See* ECF No. 148.]

that their deed-in-lieu "request" was denied for Debtors' failure to complete the necessary

documents.

Meanwhile, in December 2011, HSBC changed Debtors' mail code, turning off Debtors'

monthly Billing Statements and activating monthly Informational Statements.  From December

2011 to May 2012, Debtors received statements in HSBC's "Informational Statement" form.

[*See* ECF Nos. 148-4 to -9.]  These statements, each one page in length, referred throughout to

"Voluntary Payment[s] to keep Mortgage Current" and "Payment Date[s] (to keep mortgage

current)."  They did not reference "payments due" and "payment dates," as in the regular Billing

Statements.  They made no mention of potential late fees.  Importantly, they contained a two-

paragraph disclaimer, printed in a point size equal to that of the type in the rest of the document,

and located in a large box on the right side of the page, immediately under the "Informational

Statement" heading.  The disclaimer reads as follows:

> This informational statement is NOT an attempt to collect any debt from you, as
> you have obtained a discharge of personal liability in bankruptcy.  You are not
> personally liable to make any payment on your mortgage loan, and any payment
> you may make is voluntary.
>
> However, HSBC Mortgage Services retains a mortgage lien on the property
> located at 154 OVERLAND RDG APT 231.[3]  You have informed us that you
> intend to keep your mortgage current and you have asked that we send you this
> statement to show the remaining balance against the property, to provide a receipt
> of previous voluntary payments made and/or to indicate the next voluntary
> payment to keep the mortgage current.

Contrary to the form language in these statements, the parties stipulated that Debtors never asked

to receive the Informational Statements.

After Debtors' alleged deed-in-lieu request was denied, an HSBC employee again re-

coded Debtors' account to send regular Billing Statements which Debtors received from June

---

[3] This is a mistaken reference to the apartment to which Debtors moved prior to filing for bankruptcy, rather than the
Erlanger property on which Respondents actually had a mortgage lien.

through October 2012. [*See* ECF Nos. 148-10 to -14.] These statements were worded almost

identically to the Billing Statements that Debtors received in 2011.

On October 18, 2012, HSBC discovered this coding error in a quality-control audit, and

changed Debtors' mail code to activate Informational Statements. The following day, Beneficial

filed a foreclosure action against the Debtors in Kenton County Circuit Court, seeking an in rem

judgment and a sale of the Erlanger property. From October 24, 2012 to August 24, 2013,

Respondents continued to send Debtors Informational Statements advising them of the payment

amounts needed to keep their mortgage current. [*See* ECF Nos. 148-15 to -23.][4] These two-page

Informational Statements contained a first page identical to the prior batch of one-page

Informational Statements sent in 2011-12. The second pages of these statements, however, each

contained the following "Important Reminder": "Your account is now seriously overdue. We

expect you to pay the past due amount immediately." The statements also informed Debtors that

they were "past due in making [their] monthly Hazard Insurance payments."

Debtors opposed Beneficial's foreclosure action.[5] On September 9, 2013, eleven months

after the foreclosure filing, an HSBC employee noted in Debtors' account that Debtors were

involved in contested litigation with Respondents. Respondents claim this notation caused

Debtors' mail code to change and reactivated regular Billing Statements. On September 26,

2013, the Kenton Circuit Court entered a judgment in favor of Beneficial in its foreclosure

action. [*See* ECF No. 61-6.] This judgment, however, did not prompt HSBC to stop sending

Billing Statements to the Debtors. Instead, Debtors received two more regular Billing

Statements in September and October 2013. [*See* ECF Nos. 148-24, -25.] These statements

were worded substantially the same as the post-discharge Billing Statements Debtors previously

---

[4] No Informational or Billing Statement was sent in November 2012.

[5] Specifically, Debtors opposed entry of summary judgment pending further discovery to investigate claims against
Respondents based on Respondents' post-bankruptcy foreclosure conduct. [*See* ECF No. 61-5.]

received.  Finally, in November 2013, when Respondents received notice of Debtors' motion for

contempt for discharge violations [ECF No. 40], an HSBC employee coded Debtors' account to

stop the transmission of all statements.

### C.  Procedural History.

#### 1.  Debtors' Adversary Proceeding.

On February 13, 2013, some seventeen months after Debtors first received post-discharge

Billing Statements from Respondents, Debtors moved to reopen their case to file an adversary

proceeding against Respondents for their alleged violations of the discharge injunction.  The

Court granted their motion.  Two weeks later, Debtors filed an adversary complaint against

Respondents seeking actual damages, punitive damages, and injunctive relief both for

themselves and a nationwide class of debtors for alleged violations of the statutory discharge

injunction.  Due to a defect in service, Respondents never received Debtors' complaint.  When

Debtors requested precertification discovery, the Court dismissed their adversary proceeding sua

sponte holding that contempt is the only remedy for violations of the discharge injunction which

must be litigated by motion in a debtor's main bankruptcy case, not in an adversary proceeding.

*See Biery v. Beneficial Ky., Inc. (In re Biery)*, Ch. 7 Case No. 10-23338, Adv. No. 13-2005, 2013

WL 4602698, at *2 (Bankr. E.D. Ky. Aug. 29, 2013) [hereinafter *Biery I*] (citing *Pertuso v. Ford*

*Motor Credit Co.*, 233 F.3d 417 (6th Cir. 2000) and *Frambes v. Nuvell Nat'l Auto Fin., LLC (In*

*re Frambes)*, 454 B.R. 437 (Bankr. E.D. Ky. 2011)).

#### 2.  Debtors' Contempt Motion.

On September 16, 2013, Debtors filed a contempt motion against Respondents, claiming

that Respondents were in contempt of their discharge injunction and the discharge injunctions of

a nationwide class of debtors.  Debtors alleged receiving many of the statements described

above, to which Respondents have now stipulated.  As to the class, Debtors claimed that

Respondents had a policy and practice of sending billing statements and misleading informational statements to discharged chapter 7 debtors.  Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (3), made applicable to this proceeding pursuant to Federal Rules of Bankruptcy Procedure 7023 and 9014(c),[6] Debtors sought to represent a nationwide class of discharged chapter 7 debtors with loans of any kind from Respondents, who had received any communications or correspondence from Respondents attempting to collect debts or obtain possession of collateral after the discharge or stay became effective.  Finally, they sought actual and punitive damages, attorneys' fees, and declaratory and injunctive relief, both for themselves and the proposed class.

The Court ordered Debtors to brief whether, as a matter of law, it could certify a class motion for contempt.  Debtors' memorandum argued that contempt claims were adjudicable on a class basis, and narrowed their proposed class to debtors who received discharges from this Court.  In November 2013, Respondents entered their first appearance in this matter, representing that they had only become aware of Debtors' contempt motion upon receipt of a properly served scheduling order.  Shortly thereafter, Respondents moved under Bankruptcy Rule 9014 to apply Bankruptcy Rule 7068 to Debtors' contempt motion.  *See* FED. R. BANKR. P. 7068 (providing that FED. R. CIV. P. 68, the offer of judgment rule, applies in adversary proceedings).  Debtors objected to Respondents' motion and moved to clarify the scope of discovery, claiming that Respondents refused to answer discovery requests pertaining to class certification.

The Court denied Respondents' motion, reasoning that the "purposes of [Rule 68] encouraging settlement and penalizing the unreasonable refusal of settlement offers were

---

[6] References to the Federal Rules of Civil Procedure will appear as "Rule ___," and references to the Federal Rules of Bankruptcy Procedure will appear as "Bankruptcy Rule ____."

misplaced in a contempt proceeding, given the Court's interest in learning of and adjudicating contempt of its own orders." *In re Biery*, No. 10-23338, 2014 WL 1431947, at *2 (Bankr. E.D. Ky. Apr. 14, 2014) [hereinafter *Biery II*] (summarizing the Court's order, entered on December 17, 2013, denying Respondents' motion). The Court treated Debtors' motion to determine the scope of discovery as a motion to apply Bankruptcy Rule 7023 to their contempt motion, and ordered Respondents to file a response. Thereafter, the Court entered an opinion and order holding it had discretion to apply Bankruptcy Rule 7023 to Debtors' contempt motion and would exercise that discretion.[7]

### 3. Debtors' Motion for Class Certification.

The parties took precertification discovery for approximately one year. On June 26, 2015, Debtors moved for class certification. [ECF No. 119.] Their proposed class definitions are discussed in detail in the Court's analysis below. As is relevant here, Debtors initially moved to certify a class of persons with loans administered by Respondents who received chapter 7 discharges from this Court between September 16, 2008,[8] and the present, and who received written communications from Respondents attempting to collect a debt post-discharge. In their reply brief, Debtors separated their original class into two proposed subclasses. Respondents were given an opportunity to respond to this change in definition in a surreply. Debtors' proposed subclass definitions are as follows:

> All persons with real estate loans administered by Beneficial Kentucky, Inc., or HSBC Mortgage Services, Inc., between September 16, 2008 and the present, who filed a Chapter 7 bankruptcy petition in the Eastern District of Kentucky which resulted in the entry of a discharge and who received a regular billing statement after the discharge became effective [the "Billing-Statement subclass"].

---

[7] Bankruptcy Rule 7023 does not apply automatically to contempt motions; thus, Debtors could not move for class certification or take precertification discovery absent an order applying Bankruptcy Rule 7023 to Debtors' contempt motion. *See* FED. R. BANKR. P. 9014(c) (providing that Bankruptcy Rule 7023, and thereby Rule 23, *may* be applied in contested matters).

[8] September 16, 2008, is the date five years before the filing of Debtors' contempt motion.

> All persons with real estate loans administered by Beneficial Kentucky, Inc., or HSBC Mortgage Services, Inc., between September 16, 2008 and the present, who filed a Chapter 7 bankruptcy petition in the Eastern District of Kentucky which resulted in the entry of a discharge and who received an Informational Statement after the discharge became effective [the "Informational-Statement subclass"].

[ECF No. 134 at 2-3.]  Debtors' certification motion also seeks the appointment of their counsel as class counsel.

A hearing on Debtors' motion for certification was held on September 1, 2015.  The Court heard argument and limited live testimony.  The key pieces of evidence Debtors offered in support of certification were the declarations (with exhibits) of Robert Sparks, an attorney for the Debtors, and the deposition (with exhibits) of Phyllis Johnston, Respondents' corporate representative.  Mr. Sparks' first declaration [ECF No. 121] stated that Respondents produced post-discharge communications to approximately 349 debtors, counting co-filing debtors as one debtor.  Of these 349, approximately 200 received a regular billing statement or informational statement.  Mr. Sparks' supplemental declaration [ECF No. 135], filed after Debtors modified their proposed class definition in their reply brief, stated that Respondents sent approximately 87 debtors a total of approximately 863 regular Billing Statements, and that Respondents sent approximately 169 debtors a total of approximately 3,143 Informational Statements.

Mr. Sparks' initial declaration contained twenty-seven exhibits, all of which are examples of Respondents' post-discharge communications to proposed class members that Respondents produced in precertification discovery.  Of these exhibits, seven [ECF Nos. 121-2 to -8] are examples of Informational Statements and Billing Statements that proposed class members received.  With the exception of an electronic informational statement, these examples were again offered as exemplars in Debtors' exhibit list in support of the certification motion.  [*See* ECF Nos. 144-1, -2.]  The variations between these statements and the ones Debtors received,

and the variations among the exemplar statements themselves, are addressed in the Court's

discussion of commonality below.

Phyllis Johnston is the Senior Vice President of compliance at HSBC Mortgage Services.

Ms. Johnston testified to Respondents' corporate structure and history, and to their policies and

procedures for communicating with customers who receive discharges in bankruptcy. [ECF No.

144-3.]

Ms. Johnston testified that Respondents are both subsidiaries of HSBC Finance

Corporation. Beneficial was one of two names under which HSBC Finance had branch offices in

the United States that originated real estate loans. In March 2009, due to the downturn in the

American real estate market, HSBC Finance closed its branch offices, and became, in the United

States, "strictly a servicing shop." [ECF No. 144-3 at 19:10-19:11.] After that date, Beneficial

ceased to have employees, and all of its servicing is now conducted by HSBC.

On the subject of Respondents' policies and procedures, Ms. Johnston testified that when

Respondents receive notice of a customer's bankruptcy filing, an account representative

manually changes that customer's mail code to a "4" to stop all mail. During the pendency of a

chapter 7 case, until a debtor receives a discharge, it is Respondents' policy to never send a

statement, Billing or Informational, to a debtor even if a debtor asks to receive statements.

Ms. Johnston testified that after a chapter 7 debtor receives a discharge, Respondents'

policies change. If a chapter 7 debtor reaffirms her debt to Respondents, Respondents manually

change the mail code to "0" to activate regular Billing Statements, in the form sent to non-

bankruptcy customers. If a chapter 7 debtor does not reaffirm her debt to Respondents,

Respondents continue to suppress all mail unless the debtor or her attorney asks to receive

statements. If a debtor does ask to receive statements post-discharge, Respondents manually

change the debtor's mail code to a "7," which causes the debtor to receive Informational

Statements, and that request is recorded in Respondents' loan management system.  If the request

is verbal, an account representative makes a notation of the request; if a request is made in

writing, an image of the request is saved.  Ms. Johnston testified that this has been Respondents'

policy since the early 2000s, and her testimony was confirmed by numerous internal policies and

procedures that were listed as exhibits to her deposition.  *See, e.g.*, Bankruptcy Customer Billing

Statement Procedure [ECF No. 144-4 at 16]; Bankruptcy Mail Code (MS) Procedure CML [ECF

No. 144-4 at 31]; Bankruptcy Periodic Billing Statements Policy CML [ECF No. 144-4 at 33];

Bankruptcy Customer Billing Statement Procedure CML [ECF No. 144-4 at 36].

Ms. Johnston testified that, over the years, Respondents have endeavored to ensure

compliance with these policies and procedures by auditing changes in debtors' mail codes.  Prior

to March 2013, Respondents' audit procedures were limited to random spot-checking.

Specifically, an account representative's manager would review five accounts on which a

representative worked each month.  This review not only encompassed accounts in which a

representative changed a mail code, but accounts in which any activity occurred in a given

month.  Thus, a monthly audit of a given representative's work could fail to include any of the

mail code changes made by that representative in the month.

In March 2013, Respondents adopted a new audit procedure under which a bankruptcy

auditor reviews mail code changes.  Under this procedure, mail code changes appear on a report

that a bankruptcy auditor reviews daily.  If the auditor cannot find a reason for a mail code

change in a customer's account documents, e.g., a notation that the customer requested

statements, the auditor contacts the account representative who made the change.  If the auditor

and account representative do not agree on the change, the account representative's manager

decides whether to maintain or reverse the change.

11

Respondents' evidence challenging the application of Rule 23 is addressed in the

discussion of each element below.  Respondents do not contest the appointment of class counsel.

## II.  LAW AND ANALYSIS

### A.  Standard of Review.

Debtors seek to certify and represent two subclasses under Rule 23(c)(5), which states:

"When appropriate, a class may be divided into subclasses that are each treated as a class under

this rule."  The provision that subclasses are "treated as a class" under Rule 23 means that each

subclass must "be independently certifiable."  WILLIAM RUBENSTEIN, NEWBERG ON CLASS

ACTIONS § 4.80 (5th ed. 2015).  Thus a subclass, like a class, must "fulfill[] the four prerequisites

of Rule 23(a) . . . [and] must also meet at least one of the three requirements listed in Rule

23(b)."  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th

Cir. 2013).  In addition to the express requirements of Rule 23, a class definition "must be

sufficiently definite so that it is administratively feasible for the court to determine whether a

particular individual is a member of the proposed [sub]class."  *Young v. Nationwide Mut. Ins.

Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012) (citation omitted) (internal quotation marks omitted).

A court may only certify a class if it "'is satisfied, after a rigorous analysis, that the

prerequisites of Rule 23[] have been satisfied.'"  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.

2541, 2551 (2011) (quoting *Gen Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).  "A party

seeking class certification must affirmatively demonstrate his compliance with the Rule . . . *in

fact . . . .*"  *Id.* at 2551.  Specifically, a movant for class certification must prove "'each disputed

requirement [of Rule 23] . . . by a preponderance of evidence.'"  *In re Nexium Antitrust Litig.*,

777 F.3d 9, 27 (1st Cir. 2015) (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d

802, 811 (7th Cir. 2012)); *see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320

(3d Cir. 2008) ("to certify a class the district court must find that the evidence more likely than

not establishes each fact necessary to meet the requirements of Rule 23.").

Two aspects of this "rigorous analysis" bear further mention.  First, in deciding a

certification motion, "[m]erits questions may be considered to the extent–but only to the extent–

that they are relevant to determining whether the Rule 23 prerequisites for class certification are

satisfied." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1195 (2013).  In some

instances it will be necessary to "'resolv[e] factual and legal issues that strongly influence the

wisdom of class treatment,'" even where those issues go to the merits.  *Gooch v. Life Inv'rs Ins.*

*Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012) (quoting *Szabo v. Bridgeport Machs., Inc.*, 249

F.3d 672, 675 (7th Cir. 2001)).  But where an issue "goes solely to the merits of the case," it

cannot be considered at certification.  *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 506 n.3 (6th

Cir. 2015).

Second, those decisions on merits issues that are made at class certification are not law of

the case.  Such determinations are "'made only for purposes of class certification and [are] not

binding on the trier of facts, even if that trier is the class certification judge.'"  *In re Hydrogen*

*Peroxide*, 552 F.3d at 318 n.19 (quoting *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41

(2d Cir. 2006) [hereinafter *IPO*]); *see also Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir.

2005) ("[T]he court's determination [of a merits question] for class certification purposes may be

revised (or wholly rejected) by the ultimate factfinder.").  To the extent movants for certification

prove some element of their case at certification in order to satisfy Rule 23, they still "will . . .

have to prove [it] *again* at trial in order to make out their case on the merits."  *Wal-Mart*, 131 S.

Ct. at 2552 n.6; *see also IPO*, 471 F.3d at 39 ("A trial judge's finding on a merits issue *for*

*purposes of a Rule 23 requirement* no more binds the court to rule for the plaintiff on the

ultimate merits of that issue than does a finding that the plaintiff has shown a probability of success for purposes of a preliminary injunction.").

### B. Application of Rule 23(a) Requirements.

Rule 23(a) requires a plaintiff to establish numerosity, commonality, typicality and adequacy. The rule provides:

> (a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> > (1) the class is so numerous that joinder of all members is impracticable;
> >
> > (2) there are questions of law or fact common to the class;
> >
> > (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> >
> > (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

### 1. Numerosity.

The first Rule 23(a) prerequisite is numerosity–the requirement that the class must be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). "There is no strict numerical test for determining impracticability of joinder. . . . When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Most courts hold joinder is presumptively impracticable in a class of forty or more members. *See, e.g.*, *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co, Inc.*, 772 F.3d 111, 120 (2d Cir. 2014) ("Numerosity is presumed for classes larger than forty members."); *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) ("generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."); *Appoloni v. United States*, 218 F.R.D. 556, 561 (W.D. Mich.) ("[I]t is generally accepted that a class of 40 or

more members is sufficient to establish numerosity."), *amended by* 219 F.R.D. 116 (W.D. Mich.

2003) (amending class definition).

Mr. Sparks' supplemental declaration states that there are 87 members of the proposed

Billing-Statement subclass, and 169 members of the proposed Informational-Statement subclass.

If these numbers are correct, they easily satisfy the numerosity requirement.  Respondents

offered no direct contrary proof.  Instead, they moved to exclude Mr. Sparks' declaration,

arguing that Mr. Sparks was unable to testify in Debtors' case under a Kentucky ethics rule

which provides that a lawyer may "not act as advocate at a trial in which the lawyer is likely to

be a necessary witness," absent certain exceptions inapplicable here.  Ky. Sup. Ct. R. 3.130(3.7).

Mr. Sparks, a member of the Kentucky bar, seeks to be appointed class counsel in this matter.

The Court overruled the objection and allowed Respondents to cross-examine Mr. Sparks.

Kentucky Supreme Court Rule 3.130(3.7) does not bar Mr. Sparks' testimony.  The rule

is not a rule of evidence; it is an ethics rule that requires attorney-disqualification under certain

circumstances.  Courts routinely consider declarations by plaintiffs' counsel for purposes of

deciding numerosity.  *See, e.g.*, *del Campo v. Am. Corrective Counseling Servs., Inc.*, 254 F.R.D.

585, 588, 592 (N.D. Cal. 2008) (finding subclasses numerous on the basis of a declaration by

plaintiffs' counsel); *Perez-Olano v. Gonzalez*, 248 F.R.D. 248, 262 (C.D. Cal. 2008)

(considering a declaration by plaintiffs' counsel on numerosity); *Cortigiano v. Oceanview Manor

Home for Adults*, 227 F.R.D. 194, 199, 204 (E.D.N.Y. 2005) (finding a class numerous on the

basis of a declaration by plaintiffs' counsel).

Respondents cross-examined Mr. Sparks about the numbers in his declaration.  He

testified that he arrived at the numbers by counting the number of debtors who received regular

Billing Statements or Informational Statements that Respondents produced in discovery.  He

testified that, while Debtors' document requests were limited to statements sent to debtors within

Debtors' proposed subclass definitions, he did not verify that Respondents' production excluded statements sent to chapter 13 debtors, or to debtors who did not receive discharges.  He did, however, verify, by looking at the dates on the statements, that the statements were sent within the subclass periods.

Much of Respondents' cross-examination of Mr. Sparks, and Debtors' re-direct, addressed disclaimer language in a statement [ECF No. 121-8] attached to Mr. Sparks' declaration, which the declaration described as a "regular billing statement."  The statement in question contains, on the third page, a small-print paragraph entitled "Payment Information," the first sentence of which reads: "This language does not apply to any customer whose account was involved in a Chapter 7 bankruptcy and the account was discharged."  [ECF No. 121-8 at 3.]  Mr. Sparks acknowledged that some of the statements he counted as Billing Statements contained this language, but could not state specifically how many.[9]

Debtors have shown, by a preponderance of the evidence, that their proposed Billing-Statement subclass contains 87 members, that Debtors' proposed Informational-Statement subclass contains 169 members, and that both therefore satisfy Rule 23(a)(1).  Respondents' cross-examination of Mr. Sparks established that Mr. Sparks relied substantially on the accuracy of Respondents' document production in determining the number of subclass members. Respondents may not defeat numerosity by arguing that their own document production was inaccurate.  Moreover, Debtors' subclasses are far more numerous than they need be to satisfy Rule 23(a)(1), rendering any minor errors in production on Respondents' part immaterial.

---

[9] *See infra* pp. 28-29 for detailed discussion of this immaterial variable.

### 2.  Commonality.

#### a.  *The commonality standard.*

The second Rule 23(a) prerequisite is commonality–the requirement that there must be

"questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2).  Despite the rule's

reference to plural "questions," "for purposes of Rule 23(a)(2) even a single common question

will do."  *Wal-Mart*, 131 S. Ct. at 2556 (alterations omitted) (citation omitted) (internal quotation

marks omitted).  This does not mean, however, that commonality is easily satisfied.  For a

question to be "common to the class," it must meet three criteria.

First, a common question must apply to "each one of the claims," not just a substantial

number of class members' claims.  *Wal-Mart*, 131 S. Ct. at 2551; *see also M.D. ex rel.*

*Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (overruling, after *Wal-Mart*, circuit

precedent that held common questions need only affect "a significant number" of class

members); *In re Am. Med. Sys.*, 75 F.3d  at 1080 ("there need be only a single issue common to

*all* members of the class.") (emphasis added).

Second, a common question must be "central to the validity" of the class members'

claims.  *Wal-Mart*, 131 S. Ct. at 2551.  The class's "claims must depend upon" the answer to the

common question.  *Id.*  Therefore, a common question must concern some essential element of

class members' claims.  If a question can be answered adversely to the class without foreclosing

class members' claims, it is not a common question within the meaning of Rule 23(a)(2).

Third, a common question "must be of such a nature that it is capable of classwide

resolution."  *Id.*  A common question must "'generate common answers'" to the class.  *Id.*

(quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.

REV. 97, 132 (2009)).  If a question's answer is likely positive for some class members and

negative for others, it is not a common question.

Debtors principally argue that whether the statements at issue in each subclass violate the discharge injunction is a common question. Debtors submit that both types of statements "facially" violate the discharge injunction, without regard to factual variances in debtors' circumstances, but that in any event, whether the statements violate the discharge injunction can be answered solely by reference to the content of the statements themselves. Therefore, they conclude that whether the Billing Statements or Informational Statements violated the discharge injunction are questions with common answers. Respondents counter that whether a statement violates the discharge injunction depends on a wide array of debtor-specific factors which necessarily differ across Debtors' proposed subclasses; and thus, there are no common answers to Debtors' questions.

To assess commonality, the Court must determine whether the legality of Respondents' statements depends solely on their content, or requires additional factual analysis about the debtors to whom those statements were sent. If the statements' legality depends on debtor-specific facts, do those facts differ across Debtors' proposed subclasses, or are Debtors' subclasses materially homogeneous? On the other hand, if the legality of Respondents' statements depends only on their content, is that content materially homogeneous, or are there material differences between the statements contained in Debtors' proposed subclasses? To decide whether Debtors have proven commonality, the answers to these questions must be resolved at certification.

The Court therefore reviews the law on the discharge injunction in the residential mortgage context followed by an analysis of the law as applied to each subclass.

     *b.*   <u>*The discharge injunction in the residential mortgage context.*</u>

A chapter 7 discharge extinguishes a debtor's personal liability on all prepetition debt, including secured prepetition debt, absent certain exceptions to discharge. *See* 11 U.S.C.

§ 727(b).  The discharge "operates as an injunction against the commencement or continuation of

an action, the employment of process, or an act, to collect, recover, or offset any such debt[10] as a

personal liability of the debtor, whether or not discharge of such debt is waived."  11 U.S.C.

§ 524(a)(2).  "A violation of the discharge injunction exposes a creditor to potential contempt of

court."  *In re Frambes*, No. 08-22398, 2012 WL 400735, at *4 (Bankr. E.D. Ky. Feb. 7, 2012).

For a violation of the discharge to be contemptuous, however, it must be willful.  *See id.* at *5;

*Kanipe v. First Tenn. Bank (In re Kanipe)*, 293 B.R. 750, 756 (Bankr. E.D. Tenn. 2002) (holding

that a violation of the discharge injunction "was not willful and therefore not contemptuous.").

A violation is willful if "the creditor intended the acts that constituted the violation" and "did so

with actual knowledge of the injunction."  *Frambes*, 2012 WL 400735, at *5.

Generally, the question of whether bills sent post-discharge are contemptuous poses few

serious difficulties.  For example, a bill for a discharged unsecured debt (e.g., a credit card debt),

absent compliance with the strict reaffirmation requirements of § 524(c) or (d), is plainly an

enjoined act to collect a discharged debt as a personal liability.  If that bill is sent intentionally,

and with notice of the discharge, it is a contemptuous discharge violation.  Matters are more

complex, however, in the context of debts secured by a debtor's principal residence.

Some background regarding the evolving law in this area is necessary to evaluate the

various authorities cited by the parties.   When a debtor continues to make voluntary payments

on a secured debt to retain the property without reaffirming the debt or redeeming/surrendering

the collateral, this is sometimes referred to as a "ride through."  After discharge, a debtor is no

longer personally liable for any deficiencies on the pre-bankruptcy contract, but the secured

creditor retains the right to foreclose on its collateral in the event of default.  *See Johnson v.*

---

[10] "[S]uch debt" is a reference to "any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title."  11
U.S.C. § 524(a)(1).

*Home State Bank*, 501 U.S. 78, 82-83 (1991) (explaining the limits of the discharge with respect to mortgage interests in chapter 7).  Ride-through "creates an awkward situation wherein a creditor may legitimately possess a reason to communicate with a debtor in the post-discharge period." *Mooney v. Green Tree Servicing, Inc. (In re Mooney)*, 340 B.R. 351, 358 (Bankr. E.D. Tex. 2006).

Prior to 2005, the Code was silent on what communications were permissible in this situation.  In opinions Respondents cite, several courts reasoned that for ride-through to work, secured creditors must be permitted to advise discharged debtors how much they must pay to avoid foreclosure.  *See, e.g., Ramirez v. GMAC (In re Ramirez)*, 280 B.R. 252, 258 (C.D. Cal. 2002) ("to hold that a secured creditor is precluded from sending monthly billing statements to a debtor . . . would solely force debtors to guess, with little guidance, the due date and proper amount of their monthly payments.").  These courts reasoned that "secured creditor[s] should be encouraged to send out payment coupons, envelopes and periodic statements" to discharged ride-through debtors.  *Henry v. Assocs. Home Equity Servs., Inc. (In re Henry)*, 266 B.R. 457, 471 (Bankr. C.D. Cal. 2001).

This view, however, was far from universal.[11]  Judge Christopher Klein aptly described the state of the law during this period:  "[t]he only way [ride-through could] function [was] to recognize that communications between debtors and creditors must be governed by a rule of reason." *Garske v. Arcadia Fin., Ltd. (In re Garske)*, 287 B.R. 537, 546 (B.A.P. 9th Cir. 2002) (Klein, J., concurring).

---

[11] Notably, courts rejected attempts to certify nationwide class claims against secured creditors for discharge violations during this period, reasoning that the law on such claims was simply too variable.  One court, in denying a certification motion, observed that "'[w]hat constitutes acceptable communication between a secured creditor and a debtor taking advantage of the ride-through option varies on a case-by-[c]ase basis and even from court to court.'" *Walls v. Wells Fargo Bank, N.A.*, 262 B.R. 519, 527 (Bankr. E.D. Cal. 2001) (quoting *Kibler v. WFS Fin., Inc. (In re Kibler)*, Nos. 97-25258-B-7, 00-2604, 2001 WL 388764, at *5 (Bankr. E.D. Cal. Mar. 19, 2001)).

In 2005, Congress added subsection (j) to § 524 to clarify what communications were allowed for a principal residence mortgage ride-through:

> (j) Subsection (a)(2) does not operate as an injunction against an act by a creditor that is the holder of a secured claim, if—
>
>> (1) such creditor retains a security interest in real property that is the principal residence of the debtor;
>>
>> (2) such act is in the ordinary course of business between the creditor and the debtor; and
>>
>> (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.

11 U.S.C. § 524(j).  The precise meaning of this provision has been disputed.  A majority of courts have read the phrase "in lieu of pursuit of in rem relief to enforce the lien" in § 524(j)(3) as a limitation on the content of the communications a secured creditor may send to seek periodic payments.  These courts hold that secured creditors must inform discharged debtors, by way of clear and prominent disclaimers, that they are solely seeking payment as a substitute for pursuing their in rem rights.  *See, e.g.*, *In re Tucker*, 516 B.R. 340, 346-47 (Bankr. W.D. Va. 2014) (holding that a creditor's post-discharge requests for payment did not violate the discharge *because* they contained clear disclaimers); *Brown v. Bank of Am. (In re Brown)*, 481 B.R. 351, 361 (Bankr. W.D. Pa. 2012) (holding that a post-discharge mortgage billing statement violated the discharge because it lacked a disclaimer).

Other courts, however, read the language in § 524(j)(3) to require only that secured creditors seek payment to the exclusion of pursuing in rem relief and the content of the statement is irrelevant to the inquiry of whether the creditor's actions comply with § 524(j).

> Despite the discharge injunction, under 11 U.S.C. § 524(j), a mortgagee with a lien on a debtor's principal residence is permitted to send statements to a debtor in the ordinary course of business, instead of seeking *in rem* relief, permitting the debtor to pay the secured debt and keep the property.

*In re Gill*, 529 B.R. 31, 38 (Bankr. W.D.N.Y. 2015); *cf. Manning v. CitiMortgage, Inc. (In re Manning)*, 505 B.R. 383, 388 (Bankr. D.N.H. 2014) (holding that a lender's requests, made in response to debtor's inquiry, that debtor become current and sign a reaffirmation agreement fall within the safe harbor under 11 U.S.C. § 524(j)).  Under this reading, sending periodic Billing Statements (without disclaimers) post-discharge is not, *per se*, a violation of the discharge injunction and further analysis of the debtor's specific circumstances and the creditor's actions are necessary to determine whether the creditor may avail itself of the § 524(j) safe harbor; e.g., when sending the Billing Statement, did the creditor refrain from pursuing available foreclosure remedies?  *See Whitaker v. Bank of Am. (In re Whitaker)*, Ch. 7 Case No. 09-50301, Adv. No. 13-5008, 2013 WL 2467932, at *8-9 (Bankr. E.D. Tenn. June 7, 2013) (holding that § 524(j) does not require disclaimers, but that billing statements would cease to "serve an informational purpose" if sent after foreclosure); *cf. Connor v. Countrywide Bank, N.A. (In re Connor)*, 366 B.R. 133, 137-38 (Bankr. D. Haw. 2007) (holding that disclaimer-free billing statements do not violate the automatic stay if sent to a debtor who intends to ride through, but do violate the stay if sent to a debtor who intends to surrender).

Which of these two readings of § 524(j) is correct determines whether Debtors can satisfy the Rule 23(a) commonality requirement.  If Respondents' Billing Statements and Informational Statements comply with the discharge injunction only in some cases depending on individual, debtor-specific facts, the answers to Debtors' "common" questions are potentially not common to the proposed subclasses.  However, if the content of Respondents' statements *per se* violate the discharge injunction, a common answer may exist for the subclass.

Accordingly, for purposes of certification, it is necessary to determine if a statement can be, *per se*, a discharge violation; and if so, whether there is a common answer to that question for the defined class.  Although deciding a proposed "common" question to decide whether that

question satisfies commonality is not the norm, it is not unheard of.  In *Whirlpool*, the Sixth

Circuit considered the following two-part question to determine commonality:  (1) whether there

was a design defect in certain Whirlpool washing machines that (2) proximately caused mold to

grow in those machines.  *See Whirlpool*, 722 F.3d at 853.  The first part of that question was

necessarily common to the class; either everyone's machine was designed defectively, or no

one's was.  *See id.* at 854.

The second part of the question, however, was only potentially common to the class.  If

the answer was that, in some cases, "consumer laundry habits" were an intervening cause of

mold growth that vitiated proximate causation, the answer to the question would not be common.

*Id.*  If, on the other hand, consumer laundry habits played an insignificant causal role, the answer

to the proximate-causation question would be common.  Therefore, to determine whether the

proximate-causation question was common to the class, the Sixth Circuit decided whether

consumer habits were an intervening cause that defeated proximate causation.  The court found

that, contrary to Whirlpool's submissions, "the mold problem occurred despite variations in

consumer laundry habits," that those habits were "not the underlying cause" of mold growth, and

on that basis found commonality.  *Id., see also Rikos*, 2015 WL 4978712, at *5 n.3 (explaining

that *Whirlpool*'s rejection of Whirlpool's intervening-cause theory "was critical to disproving

Whirlpool's claim . . . that the class's common question would not yield a common answer.").

Therefore, the Court addresses Debtors' asserted common questions:  Whether

Respondents' Billing Statements and/or Informational Statements, per se, violate the discharge.

     *c.*   *Debtors have met the commonality requirement for the Billing-Statement*
         *subclass.*

As discussed above, many courts read § 524(j) to require disclaimers, while other courts

read § 524(j) to permit mortgagees to send disclaimer-free billing statements post-discharge so

long as those statements are sent exclusive of pursuit of available in rem relief.  Does § 524(j)

permit a creditor to send the same disclaimer-free statement to a discharged debtor that it sent to debtors pre-bankruptcy?  If the answer to this question is no, commonality is met in the Billing-Statement subclass.

Section § 524(j) does not permit mortgagees to send the same Billing Statements to discharged debtors that they use to collect debts from non-bankruptcy customers.  How can a communication that seeks to request payment of a personal liability when sent to a non-bankruptcy customer be something different when sent to a discharged debtor?

First, whether sending a Billing Statement is an enjoined act to collect a personal liability, or a permissible request for periodic payment in lieu of pursuing in rem relief, cannot be a question of a creditor's subjective purpose.  Rather, it depends solely on the purpose for which the statement appears to have been sent, as assessed from the four corners of the document.  As Respondents rightly observe, "'what is relevant is *not* the intent to violate the discharge, but rather the intent to commit *the act* that violates the discharge injunction.'"  [ECF No. 130 at 17 (quoting *Mahoney v. Wash. Mut., Inc. (In re Mahoney)*, 368 B.R. 579, 587 (Bankr. W.D. Tex. 2007)).]  A document that on its face requests repayment of mortgage debt as a personal liability is an act to collect a discharged debt as personal liability, even if its sender subjectively intends to send that document for a purely informational purpose.  The discharge injunction is a protection for discharged debtors.  *Botson v. Citizens Banking Co. (In re Botson)*, 531 B.R. 719, 725 (Bankr. N.D. Ohio 2015) ("It is well-established that the purpose of the discharge injunction of § 524 is to promote the fresh start policy of the Bankruptcy Code by protecting debtors against actions brought on prepetition debts.").  It would afford debtors little protection if creditors could send a statement that on its face demands repayment of discharged debts so long as this was done with good intentions.

Therefore, for a statement to have a valid informational purpose, in lieu of seeking in rem relief, the statement must announce that purpose on its face, in sufficiently clear language, such that an ordinary consumer debtor receiving the statement would understand its informational and voluntary purpose. Outstanding amounts to be paid to prevent foreclosure should generally be described as voluntary, rather than as "due," and the communication must omit language that demands payment. Most courts interpret § 524(j) this way.[12]  A statement lacks a valid informational purpose, and is an enjoined act to collect a discharged debt as personal liability, if it is identical to the statement a discharged debtor received prior to filing for bankruptcy. Such

---

[12] *See Best v. Nationstar Mortg. LLC (In re Best)*, No. NH 15-019, 2015 WL 6643649, at *6 (B.A.P. 1st Cir. Oct. 30, 2015) (post-discharge correspondence did not violate the discharge injunction where it "was limited to either seeking payment on the note so that [mortgagee] would not be forced to foreclose, or for informational purposes only . . . . and [correspondence] did not demand payment and [was] not designed to collect or recover any debt from the Debtor."); *Lovegrove v. Ocwen Loan Servicing, LLC*, No. 7:14CV00329, 2015 WL 5042913, at *6 (W.D. Va. Aug. 26, 2015) ("courts generally agree that a secured creditor may send informational statements to a debtor without violating the discharge injunction so long as the creditor's communications do not demand payment of the debt."); *Lemieux v. Am.'s Servicing Co. (In re Lemieux)*, 520 B.R. 361, 365-66 (Bankr. D. Mass. 2014) (holding that a post-discharge statement did not violate the discharge because it omitted the word "due," referred to "voluntary payment[s]," and contained a prominent disclaimer that "a hypothetical unsophisticated consumer should understand"); *id.* at 367-68 (holding that a mailing that contained multiple demands for payment violated the discharge in spite of a bankruptcy disclaimer "on page three . . . in reduced typeface"); *Bates v. CitiMortgage, Inc. (In re Bates)*, 517 B.R. 395, 399 (Bankr. D.N.H. 2014) (holding a statement containing a prominent and clear disclaimer did not violate a discharge because, "viewed objectively . . . the statements were being provided 'for informational purposes only'"); *Hernandez v. Caliber Home Loans, Inc. (In re Hernandez)*, Ch. 7 Case No. 12-37496, Adv. No. 14-03213, 2014 WL 5794840, at *3 (Bankr. S.D. Tex. Nov. 6, 2014) (holding that a statement that demanded payment, but contained a second-page disclaimer amounting to "two inconspicuous sentences in fine print hidden within paragraphs of text," violated the discharge); *In re Tucker*, 516 B.R. 340, 346-47 (Bankr. W.D. Va. 2014) (holding that a statement containing a clear disclaimer in capital letters did not violate the discharge, and distinguishing that statement from statements in other cases that contained less prominently placed disclaimers); *In re Tucker*, No. 05-12467, 2013 WL 3155419, at *3 (Bankr. S.D. Ga. June 20, 2013) (holding that a statement containing a conditional disclaimer to the effect that if the recipient was in bankruptcy, the statement was for informational purposes, but that referred to payments as due throughout, violated the discharge); *Bibolotti v. Am. Home Mortg. Servicing, Inc.*, No. 4:11-CV-472, 2013 WL 2147949, at *14 (E.D. Tex. May 15, 2013) (same); *Pearson v. Bank of Am.*, No. 3:12-CV-00013, 2012 WL 2804826, at *5 (W.D. Va. July 10, 2012) (holding that a statement that contained a clear and prominent disclaimer did not violate the discharge, and distinguishing that statement from statements in other cases that contained less prominently placed disclaimers); *Brown v. Bank of Am. (In re Brown)*, 481 B.R. 351, 361 (Bankr. W.D. Pa. 2012) (holding that a statement violated the discharge because it lacked a disclaimer and referred to due dates and past due amounts); *In re Nordlund*, 494 B.R. 507, 516-19 (Bankr. E.D. Cal. 2011) (addressing a series of statements and letters, some of which contained clear disclaimers, some of which did not, and holding that the statements that contained clear disclaimers did not violate the discharge and that the statements that lacked disclaimers violated the discharge); *Jones v. BAC Home Loans Servicing, LP (In re Jones)*, Ch. 7 Case No. 08-05439-AJM-7, Adv. No. 09-50281, 2009 WL 5842122, at *3 (Bankr. S.D. Ind. Nov. 25, 2009) (holding that a statement fell "squarely within the 524(j)(3) exception" because it contained a clear disclaimer).

statements inescapably convey the message that the creditor sending them seeks to collect a discharged debt as a personal liability.

In every case, the Billing Statements that Respondents send to discharged debtors [ECF Nos. 121-8, 148-1] are the same statements that Respondents send to non-bankruptcy customers to collect personal debts. Respondents' Billing Statements, on their face, seek to collect debts as personal liabilities. They refer to "payments due," "past due amounts," "payment due dates," and "balances owed." In cases where a customer is substantially overdue or past due in payments, the Billing Statements instruct that customer that he is "seriously overdue" and that Respondents "expect [him] to pay the past due amount immediately." Respondents' Billing Statements convey the message that their recipients personally owe money, not that their recipients may voluntarily make payments if they wish to avoid default and foreclosure.

Respondents' Billing Statements *per se* violate the discharge. Thus, the Court concludes that the answer to whether Respondents' Billing Statements violate the discharge is common to the Billing-Statement subclass, and the Rule 23 commonality requirement is satisfied.

Respondents resist this conclusion in three ways. First, they cite cases that take the minority view that a mortgagee's post-discharge billing statement does not violate the discharge so long as it is sent to the exclusion of pursuit of in rem relief. As explained above, the Court finds these cases unpersuasive. Additionally, several of the cases that Respondents cite for this point predate the enactment of § 524(j) and offer little guidance on how to interpret § 524 as it reads today.

Second, Respondents argue that even a facial demand for payment does not violate the discharge injunction unless it is shown (i) that a debtor actually receives, reads, and interprets the statement to demand payment; and (ii) the demand successfully induces or is likely to induce

repayment (which depends on the particular debtor's understanding of the discharge injunction).
This argument is without merit.

Respondents rely on cases considering whether facially permissible actions that
potentially coerce repayment (for example, reporting a discharged debt as unpaid to credit
agencies) violate the discharge.  In this context, some courts have held that such an act is an act
to collect a discharged debt if, and only if, its effect is to coerce repayment.  *See Paul v. Iglehart*
*(In re Paul)*, 534 F.3d 1303, 1308 (10th Cir. 2008); *In re Mahoney*, 368 B.R. at 589.  Otherwise,
these courts reason, an act which on its face is not an act to collect cannot be characterized as an
act to collect.  Conversely, when a post-discharge communication facially demands repayment of
a discharged debt, no court has held it must inquire into whether the demand was effective to
determine whether the demand is an enjoined act.  It may be that a post-discharge payment
demand will be ineffective because discharged debtors will understand that the demand is
improper and that they have no obligation to pay; yet, this has no bearing on whether the act
itself violates the discharge injunction.

This argument makes a mockery of the discharge injunction for debtors and creditors
alike.  On Respondents' view, a debtor is completely unprotected by the discharge injunction
from dunning letters so long as he "specifically knew that notwithstanding a purported demand
for payment . . . he had no obligation to make any payment."  [ECF No. 130 at 26 n.15.]  This
view offers no statutory guidance on what acts are enjoined.  Specifically, whether sending a
billing statement was enjoined, would depend on facts completely outside a creditor's control;
to-wit: whether a debtor received the statement, whether he read the statement, and whether he
was susceptible to post-discharge collection.  The Court is unaware of any injunction that enjoins
an action if, and only if, the other party reacts in a certain way to the enjoined party's action.
The rule Respondents describe is simply not an injunction.

Finally, at the certification hearing, Respondents suggested the Billing-Statement subclass lacks commonality because the Billing Statement attached to Mr. Sparks' declaration [ECF No. 121-8] (the "Declaration Statement") contained language on the third page which could be read as a disclaimer and the subclass contains some debtors who received a statement with this language and some who did not.  This argument fails because the disclaimer language in that statement is insufficient to bring it in compliance with § 524(j).

The inclusion of debtors who received statements substantially similar to the Declaration Statement in the Billing Statement subclass does not defeat commonality.  The Declaration Statement was sent to Respondents' non-bankruptcy customers.  The Declaration Statement's first two pages are identical to the two pages of the Billing Statements the Debtors received. Like the Debtors' statements, they refer to payments due, payment due dates, and balances owed. The Declaration Statement also informs overdue customers that their account is "seriously overdue" and that Respondents expect the recipient "to pay the past due amount immediately." [ECF No. 121-8 at 1-2.]  On the third page of this statement, in small print, there is a section entitled "Payment Information."  [*Id.* at 3.]  That section begins with the sentence:  "This language does not apply to a customer whose account was involved in a Chapter 7 bankruptcy and the amount was discharged."  [*Id.*]  The section then proceeds to instruct customers on how to make payments.

Courts that hold § 524(j) requires disclaimers have invariably held that inconspicuous disclaimers of this kind do not bring a statement within the § 524(j) safe harbor.  *See* cases cited *supra* note 12.  This particular disclaimer, however, is even weaker than many disclaimers courts have held insufficient.  Numerous courts have held that a statement violates the discharge injunction when it contains both payment demands and an inconspicuous disclaimer stating that as to discharged debtors, the entire statement is being sent for an informational purpose.  *See,*

*e.g., Hernandez*, 2014 WL 5794840, at *3 (statement that demanded payment, but contained a second-page disclaimer amounting to "two inconspicuous sentences in fine print hidden within paragraphs of text," violated the discharge); *Tucker*, 2013 WL 3155419, at *3 (statement containing a conditional disclaimer to the effect that if the recipient was in bankruptcy, the statement was for informational purposes, but that referred to payments as due throughout, violated the discharge); *Bibolotti*, 2013 WL 2147949, at *14 (same).  The disclaimer in the Declaration Statement only disclaims the applicability of certain payment information on the third page of the statement.  It disclaims nothing else in the document.  The fact that even a very careful reader of the Declaration Statement's fine print would understand that certain payment instructions do not apply to him would not affect his understanding of the prominent payment demands contained on the first two pages of the statement.

Therefore, the differences among the Billing Statements received by subclass members are immaterial and do not defeat commonality.

Respondents have also argued that the definition of the Billing-Statement subclass is vague because it refers to "regular billing statements," an undefined term.  The Court agrees.  In place of the phrase "regular billing statements," the Court will insert into the subclass definition the phrase "a statement substantially similar to the statements in the record at ECF Nos. 121-8 and 148-1."

Debtors have met the commonality requirement of Rule 23(a) for the proposed Billing-Statement subclass.

> d. *Debtors have failed to meet the commonality requirement for the Informational-Statement subclass.*

Debtors contend that whether Respondents' Informational Statements violate the discharge is a common question to the Informational-Statement subclass.  As explained above,

this is a common question only if the answer is that either all or none of the Informational

Statements violate the discharge.

Here, there is no commonality for several reasons.  First, subclass members received

materially differing statements; thus, they have no common answer to the arguably common

question of whether Respondents' Informational Statements all *per se* violated the discharge.

The claims of each subclass member "must depend upon" the answer to a question for that

question to be common.  *Wal-Mart*, 131 S. Ct. at 2551.  The claim of a subclass member who

received a statement with one disclaimer does not depend on whether a statement with a

completely different disclaimer violates the discharge, or whether all of Respondents' statements

with varying disclaimers violate the discharge.  A member's claim only depends on whether *his*

statement violates the discharge.  Here, the variations between Respondents' Informational

Statements are too great for subclass members to share a common interest in whether

Respondents' Informational Statements all violate the discharge.

As discussed above, Debtors themselves received two different types of Informational

Statements.  Both contain the following prominent disclaimer:

> This informational statement is NOT an attempt to collect any debt from you, as
> you have obtained a discharge of personal liability in bankruptcy.  You are not
> personally liable to make any payment on your mortgage loan, and any payment
> you may make is voluntary.
>
> However, HSBC Mortgage Services retains a mortgage lien on the property
> located at 154 OVERLAND RDG APT 231.  You have informed us that you
> intend to keep your mortgage current and you have asked that we send you this
> statement to show the remaining balance against the property, to provide a receipt
> of previous voluntary payments made and/or to indicate the next voluntary
> payment to keep the mortgage current.

While the first type of Informational Statement that Debtors received was only one page long,

the second type contained a second page that proceeded to demand payment, stating that: "Your

account is now seriously overdue.  We expect you to pay the past due amount immediately."

Perhaps this language, read in the context of the disclaimer that preceded it, does not cause the statement to violate the discharge.  Alternatively,  perhaps both types of statements violate the discharge due to an insufficiently clear disclaimer; however, a debtor who received one type of Informational Statement has no interest in whether another version violates the discharge.  His claim only depends on whether the statement he received violates the discharge, not whether a substantially different statement does.

Further, the Informational Statements attached to Mr. Sparks' declaration exhibit more variations.  One of the Informational Statements states that it was "NOT an attempt to collect any debt" [ECF No. 121-7 at 1], but on the second page says: "This is an attempt to collect a debt by a debt collector."  [*Id*. at 2.]  That language is preceded, three paragraphs above, by a disclaimer to the effect that "[t]his language does not apply to any customer whose account was involved in a Chapter 7 bankruptcy and the account was discharged" [*id.*], but it is unclear whether that disclaimer applies to the debt-collection notice three paragraphs below.

Another form Informational Statement, sent in 2014, switches to entirely different disclaimer language from the earlier Informational Statements that preceded it.  This disclaimer conditionally advises recipients that "[t]o the extent your original obligation was discharged . . . this statement is for compliance and/or informational purposes only and does not constitute an attempt to collect a debt or to impose personal liability for such obligation."  [ECF No. 121-2 at 1.]  Prior Informational Statements acknowledged recipients' discharges as a fact.  Unlike prior Informational Statements, the 2014 statement does not refer to "voluntary payments" and "voluntary payment dates," but to "this month's payment" and "outstanding past payments." [*Id.*]  A subclass member who received a statement with this language would have little interest in whether previous statements with "voluntary payment" language and more emphatic disclaimers violated the discharge.  Even if the answer to whether his statement and prior

31

statements violate the discharge is common, his claim does not depend on the answer to that question.

Debtors also suggested at oral argument that two other questions were common to the Informational-Statement subclass. First, they argued that the kinds of damages awardable to the subclass is a question that is common to the class. Specifically, Debtors suggest that the determination of whether the Court can award punitive damages in a class-motion for contempt is a question that satisfies commonality.[13]

The question of whether punitive damages are awardable to the subclass does not satisfy commonality. While the availability of a remedy is important to subclass members' claims, their claims do not depend upon the availability of punitive damages. Even if subclass members cannot obtain punitive damages, they still will have claims. Debtors and Respondents agree that actual damages are an available remedy for contemptuous violations of the discharge injunction. Debtors have cited no cases holding that a question about the availability of a particular kind of monetary remedy satisfies commonality. The Court therefore rejects Debtors' argument that the question of whether the Court may award the Informational-Statement subclass punitive damages satisfies commonality.

Debtors have failed to prove commonality as to the proposed Informational-Statement subclass.

---

[13] Debtors suggest this determination will be made at trial; however, in class actions, courts usually decide what damages claims they are certifying at certification, especially when plaintiffs seek punitive damages. *See, e.g., Johnson v. Nextel Commc'ns, Inc.*, 780 F.3d 128, 148-50 (2d Cir. 2015) (deciding, on review of a class certification order, whether punitive damages claims could be certified for class treatment); *E.E.O.C. v. Performance Food Grp., Inc.*, 16 F. Supp. 3d 576, 581-82 (D. Md. 2014) (deciding whether to certify punitive damages claims at certification); *E.E.O.C. v. Sterling Jewelers, Inc.*, 788 F. Supp. 2d 83, 88-91 (W.D.N.Y. 2011) (same). Courts generally decide at certification what kinds of damages claims can be made in the class trial, because those determinations affect whether class representatives are adequate, and whether, in a Rule 23(b)(3) damages class, common questions predominate over individual ones, and whether class treatment is superior to individual adjudication.

**3. Typicality.**

*a. The typicality standard.*

The third Rule 23(a) prerequisite is typicality–the requirement that "the claims or
defenses of the representative parties are typical of the claims or defenses of the class." FED. R.
CIV. P. 23(a)(3).  "'[T]he commonality and typicality requirements of Rule 23(a) tend to merge.
Both serve as guideposts for determining . . . whether the named plaintiff's claims and the class
claims are so interrelated that the interests of the class members will be fairly and adequately
protected in their absence.'"  *Wal-Mart*, 131 S. Ct. at 2551 n.5 (quoting *Falcon*, 457 U.S. at 157
n.13).  Thus, typicality will rarely be satisfied where commonality is lacking.

However, typicality has some independent content of its own.  Even where commonality
is present, "the typicality requirement is not satisfied when a plaintiff can prove his own claim
but not 'necessarily have proved anybody[] else's claim.'"  *Beattie v. CenturyTel, Inc.*, 511 F.3d
554, 561 (6th Cir. 2007) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir.
1998) (en banc)).  Though proof of the named plaintiff's claim need not fully prove every class
member's claim, a typical class representative must "advance the interests of the entire . . . class"
in "pursuing their own claims."  *Sprague*, 133 F.3d at 399.

*b. The Billing-Statement subclass.*

Debtors' claims are typical of the claims of the Billing-Statement subclass.  If Debtors
successfully prove at trial that Respondents' Billing Statements violate the discharge, and that
Respondents intentionally send the statements they send, this will go a long way towards proving
the claims of the subclass.  All that will remain are individual defenses, e.g., whether a debtor

reaffirmed his/her debt with Respondents, or whether a debtor asked to receive statements.[14]

Debtors satisfy the typicality requirement as to the Billing-Statement subclass.

   c.   *The Informational-Statement subclass.*

Debtors do not satisfy typicality as to the Informational-Statement subclass. They cannot

show typicality because they cannot show commonality. Because of the wide variation in the

content of the Informational Statements that subclass members received, Debtors prevailing on

their own claim would not necessarily go far towards proving the subclass's claims as a whole.

## 4. **Adequacy.**

The final Rule 23(a) prerequisite is adequacy–the requirement that "the representative

parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The

Sixth Circuit has "articulated two criteria for determining adequacy of representation: '1) the

representative must have common interests with unnamed members of the class, and 2) it must

appear that the representatives will vigorously prosecute the interest of the class. . . .'" *Am. Med.*

*Sys.*, 75 F.3d at 1083 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)).

A class representative who lacks typical claims is inadequate, "because in the absence of typical

claims, the class representative has no incentives to pursue the claims of the other class

members." *Id.* Having found that Debtors' claims are not typical of the Informational-Statement

subclass, the Court confines its discussion to whether Debtors are adequate representatives of the

Billing-Statement subclass. Respondents argue Debtors are not adequate representatives because

of a conflict of interest and an alleged inability to vigorously pursue the class claims.

---

[14] The Court does not determine here that a regular Billing Statement would necessarily comply with the discharge
so long as its recipient asked to receive statements for informational purposes, but only to suggest that requests
could potentially be an individual defense.

a.   _Conflict of interest._

Respondents argue that Debtors are inadequate representatives because they have a conflict of interest with absent subclass members.  They argue that Debtors' choice to forego seeking actual damages, and to only seek attorney's fees, punitive damages, and coercive sanctions, would likely preclude absent class members from seeking actual damages in future litigation.  Therefore, they conclude that Debtors have a conflict of interest with absent class members who have viable actual-damages claims.

Many courts have held proposed class representatives inadequate where their choice to forego some remedy would potentially preclude absent class members from pursuing that remedy in individual litigation.  _See, e.g._, _Burkhead v. Louisville Gas & Elec. Co._, 250 F.R.D. 287, 296-97 (W.D. Ky. 2008); _Martin v. Home Depot U.S.A., Inc._, 225 F.R.D. 198, 203-04 (W.D. Tex. 2004); _see also Nelson v. Wal-Mart Stores, Inc._, 245 F.R.D. 358, 372-73 (E.D. Ark. 2007) (finding plaintiffs adequate representatives and resolving res judicata issue as to compensatory and punitive damages for absent class members by certifying a class only on the issues of classwide liability and declaratory and equitable relief).

However, absent a serious risk that Debtors' waiver of actual damages would preclude absent class members from seeking actual damages in future litigation, Respondents' argument fails.  _See In re Vitamin C Antitrust Litig._, 279 F.R.D. 90, 115-16 (E.D.N.Y. 2012) (assessing the risk of preclusion in determining the adequacy of a class representative who waived remedies); _Nelson_, 245 F.R.D. at 372 (explaining that courts must "assess the risk of res judicata in order to determine the adequacy" of a class representative who waives remedies).  Here, the Court concludes that there is no risk of claim preclusion.

First, the Sixth Circuit has held that "'[a] class action, of course, is one of the recognized exceptions to the rule against claim-splitting'"–the very rule which Respondents argue would

preclude class members from pursuing actual damages.  *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672

F.3d 402, 428 n.16 (6th Cir. 2012) (quoting *Gunnels v. Healthplan Servs., Inc.*), 348 F.3d 417,

432 (4th Cir. 2003)) (internal quotation marks omitted).[15]  The Sixth Circuit explained that under

"the same general principle that claim preclusion does not apply to matters that could not be

advanced in a prior action, individual actions remain available to pursue any other questions that

were expressly excluded from the class action."  *Id.* (quoting 18A CHARLES ALAN WRIGHT,

ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4455 (2d ed.

1996)).  When a class is certified and certain remedies are left out of the scope of class

certification, an absent class member has no power to advance claims for those remedies in the

class action.  (The class representative who opted not to pursue a particular remedy, however, is

barred from seeking them in subsequent litigation.)  The rule against claim-splitting, therefore,

does not apply when an absent class member pursues excluded remedies in future litigation.[16]

Second, the rule against claim-splitting does not apply where "[t]he court in the first

action has expressly reserved the plaintiff's right to maintain the second action."  RESTATEMENT

(SECOND) OF JUDGMENTS § 26(1)(b) (1982); *Guzowski v. Hartman*, 849 F.2d 252, 255 nn.1-2 and

---

[15] *Gooch* involved a piecemeal certification of a declaratory-relief class, with a motion for certification of a damages class to come at a later phase in the litigation.  The court wrote that piecemeal certification would not "present a problem of preclusion" as to damages claims because class actions are an exception to the rule against claim-splitting.  *Gooch*, 672 F.3d at 428 n.16.  Later in the footnote, in the context of addressing *issue* preclusion (because members of a non-opt-out declaratory relief class could lose their monetary claims), the court wrote that "preclusion is not possible here" because monetary claims would be pursued at a later stage of the litigation.  *Id.*

[16] Respondents cite a 1986 Sixth Circuit decision, *King v. S. Cent. Bell Tel. & Tel. Co.*, 790 F.2d 524 (6th Cir. 1986), which they claim held that the rule against claim-splitting applies to class actions.  *King* quotes a case setting forth the rule against claim-splitting, among other principles of res judicata, *see King*, 790 F.2d at 528 *(*quoting *Westwood Chem. Co. v. Kulick*, 656 F.2d 1224, 1227 (6th Cir. 1981)), and then states that "[i]n the context of class actions, these principles apply with equal and even greater force."  *King*, 790 F.2d at 528.

This statement, however, is dictum, contained in a section of the opinion entitled "General Principles of Res Judicata."  *Id.*  When the court turned to deciding the question before it–whether claims by a member of a class action filed in federal court in Louisiana were barred by the class settlement–it relied on *Fifth* Circuit precedent on claim preclusion and class actions, apparently on the theory that Fifth Circuit law controlled the preclusive effect of a class action filed in the Fifth Circuit.  *See id.* at 528-29 (relying extensively on *Kemp v. Birmingham News Co.*, 608 F.2d 1049 (5th Cir. 1979), *abrogated by Southmark Props. v. Charles House Corp.*, 742 F.2d 862, 870 n.12 (5th Cir. 1984)); *id.* at 529 (relying on another Fifth Circuit precedent in order to decide adequacy of notice).  *King* was a case about relitigation of settled claims, not claim-splitting.  The Court concludes that the more recent holding in *Gooch* controls the issue of claim-splitting and class actions in the Sixth Circuit.

accompanying text (6th Cir. 1988) (acknowledging this exception to the rule against claim-splitting).  At least one court has allayed preclusion-driven adequacy concerns by "expressly reserv[ing] the right of [class members] to maintain their damages claims in subsequent proceedings notwithstanding their participation" in a class action that excluded damages claims. *Vitamin C*, 279 F.R.D. at 116.  That court acknowledged that its reservation was "not a guarantee of what subsequent courts . . . will do," but held that given the wide acceptance of the principle that such reservations are an exception to claim preclusion, said its reservation was "sufficient to extinguish defendants' claim-splitting concerns for the purpose of class certification."  *Id.*

Here, a reservation of class members' rights to maintain claims for actual damages generally extinguishes claim-splitting concerns.  The only court in which absent class members (all of whom are debtors within this District) can file contempt motions for violations of their discharge injunctions is in this Court, which entered those discharge injunctions.  This Court can ensure that it will honor its own reservation.  Therefore, the Court  will expressly preserve the rights of absent class members to seek individual actual damages in subsequent proceedings.  With that reservation, the risk that Debtors would preclude absent class members' damage claims is insignificant, and Debtors have no conflict of interest with absent class members.  To the contrary, given the Court's reservation, absent class members with actual-damages claims would benefit from a class-wide judgment holding that their discharge was violated.

   b. *Vigorous representation*.

In furtherance of their challenge to adequacy, Respondents argue that Debtors cannot vigorously represent either subclass because they lack a sufficient knowledge of the case.  The parties agree on the applicable standard, both citing *J.B.D.L. Corp. v. Wyeth-Ayerst Labs. Inc.*, 225 F.R.D. 208 (S.D. Ohio 2003), which held that "the named plaintiff must possess a sufficient knowledge and understanding of the case that he may be said to be capable of controlling or

prosecuting the litigation," or phrased otherwise, "a working knowledge of the instant action."
*Id.* at 216.

In their efforts to prove Debtors are inadequate class representatives, Respondents cross-examined Debtor Sandra Biery at the certification hearing.  Mrs. Biery testified that she instructed her attorneys to file a motion for contempt containing class allegations.  She testified that since the filing of the motion, she has met with counsel six to eight times, has communicated with them outside those meetings by telephone and email, and in those communications has provided counsel with information and input on the conduct of these proceedings.  She accurately testified to the definition of her proposed subclasses, and testified that she and her counsel decided to narrow the proposed class definition.  She also accurately testified to the distinction between the two subclasses, explaining that Informational Statements are statements with disclaimers, while regular Billing Statements lack disclaimers.  And she testified that she understood her duties as a class representative would be to monitor the case and ensure, to the best of her efforts, that the outcome of the case was fair for class members.

On the substance of her claims, she testified that while she did not make post-discharge payments in response to Respondents' Billing Statements, she and her husband felt threatened and confused by those statements, and wondered if, in spite of their discharge, they were still obligated to pay their discharged debt.  She testified that Respondents' actions caused her stress, and that she filed this motion on behalf of a class to protect similarly situated debtors.  Finally, she testified that she seeks monetary and injunctive/declaratory relief for herself and the subclasses, and values them equally.

Mrs. Biery was a credible witness and exhibited a proficient working knowledge of this case.  She cogently explained the nature of her claims and the relief she seeks for the subclasses.  Mrs. Biery did, at one point, answer in the affirmative when asked whether she was seeking

monetary relief for her stress.  Debtors, of course, have waived any request for actual damages.

The adequacy requirement, however, does not require that a class representative be capable of

accurately parsing the legal distinction between compensatory damages for emotional distress,

and noncompensatory sanctions for causing emotional distress.  It only requires a layman's

understanding of the relief the class seeks.  The Court finds Debtors are capable of vigorously

representing the Billing-Statement subclass, and finds the Debtors are adequate representatives

under Rule 23(a)(4).

### C.  Application of Rule 23(b) Requirements.

Having found that the Debtors' proposed Billing-Statement subclass meets the

prerequisites of Rule 23(a), the Court turns to a determination of whether Debtors have

demonstrated that the Billing-Statement subclass meets the additional requirements of Rule

23(b).[17]

### 1.  Rule 23(b)(2) – Injunctive Relief.

In their reply brief, the Debtors moved to certify the subclasses under Rule 23(b)(2).[18]

[*See* ECF No. 134 at 7-8.]  Rule 23(b)(2) provides that a "class may be maintained if Rule 23(a)

is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that

apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole."  FED. R. CIV. P. 23(b)(2).

Under Rule 23(b)(2), Debtors seek to certify requests for injunctive relief, declaratory

relief and, potentially, a purgeable coercive fine to be imposed if Respondents do not come into

compliance with the discharge injunction.

---

[17] As Debtors failed to demonstrate that the Informational-Statement subclass meets the requirements of Rule 23(a), it is not necessary for the Court to determine whether that subclass is maintainable under Rule 23(b).

[18] Debtors alleged in their contempt motion that their proposed class was certifiable under Rule 23(b)(2) [*see* ECF No. 40 ¶ 52], but did not move to certify Rule 23(b)(2) subclasses until the reply.

Respondents argue that Debtors' request to certify a Rule 23(b)(2) subclasses is waived. After Debtors filed their reply and changed their proposed class definition, Respondents were given leave to file a surreply and responded at length to Debtors' request for Rule 23(b)(2) certification. [*See* ECF No. 142 at 11-15.] The Court therefore sees no prejudice to Respondents in considering Debtors' request for Rule 23(b)(2) certification; however for the reasons that follow, the Court will deny that request.

Rule 23(b)(2) permits a court to certify a class where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). For Rule 23(b)(2) certification to be appropriate, the conduct of the party opposing the class must be "such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 131 S. Ct. at 2557 (internal quotation marks omitted). Where "individual class member[s] would be entitled to a *different* injunction or declaratory judgment" from each other, Rule 23(b)(2) "does not authorize class certification." *Id.*

The Court has previously denied Debtors' request for injunctive relief. In *Biery I*, the Court dismissed Debtors' request for injunctive relief because an injunction against violating the discharge injunction would be superfluous. *See Biery I*, 2013 WL 4602698, at *3.

The Court denies Debtors' request to certify the Billing-Statement or Informational-Statement subclass under Rule 23(b)(2).

### 2.  Rule 23(b)(3) – Damages.

Debtors also move to certify the subclasses under Rule 23(b)(3). Rule 23(b)(3) requires that the Court find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P.

23(b)(3).  In response to Respondents' contention that Rule 23(b)(3) and *Comcast Corp. v.*

*Behrend*, 133 S. Ct. 1426 (2013) require a viable class-wide measurement of damages to satisfy

predominance, Debtors argue that they have viable class-wide damages in the form of  their

requests for attorneys' fees, coercive sanctions and punitive damages.[19]  Respondents counter

that Debtors cannot certify punitive damages claims, that common questions do not predominate

over individual ones and that individual adjudications are superior to class claim treatment.  The

Court first addresses the Debtors' punitive damages claims, as that will bear on both

predominance and superiority.

       *a.  Punitive Damages.*

Debtors propose to certify "punitive-damages" claims under Rule 23(b)(3).  Respondents

argue that Debtors cannot certify punitive-damages claims because: (i) bankruptcy courts either

lack authority altogether to award punitive damages for violations of the discharge injunction, or

may only award "mild" punitive damages, in amounts much less than they believe Debtors seek;

and (ii) under the Due Process Clause, punitive damages must be tethered to an award of

compensatory damages, and because Debtors have waived actual damages, punitive damages are

not awardable in this case.

Debtors responded at the hearing that (i) bankruptcy courts may award "mild punitive

damages" for contempt, and they will seek only a "mild" amount of punitive damages for each

subclass member; and (ii) their request for punitive damages would be tethered to an award of

attorneys' fees, which, in contempt proceedings for discharge violations, are treated as a form of

compensatory damages.  The Court agrees with the Debtors' contentions.

---

[19] Given the substance of Debtors' argument, whether Respondents' contention is correct is not evaluated by the Court.

Debtors assert that pursuant to a recent unpublished opinion by the Sixth Circuit, *Adell v. John Richards Homes Bldg. Co. (In re John Richards Homes Bldg. Co.)*, 552 F. App'x 401 (6th Cir. 2013), this Court can award punitive damages by virtue of its inherent powers and § 105.  In that case, the Sixth Circuit held that 11 U.S.C. § 105(a) "grants bankruptcy courts the authority to award mild noncompensatory punitive damages," *id.* at 415, for "abuse of process and fraud on the court."  *Id.* at 414.  Although the Sixth Circuit did not expressly extend its holding to noncompensatory monetary sanctions for contempt, it characterized the bankruptcy courts' authority as follows:  "While § 105(a) establishes some punitive sanction power, that power is limited to sanctions that are necessary or appropriate to enforce the Bankruptcy Code."  *Id.* at 415.

In further support of their position, Debtors cite *In re Borowski*, 216 B.R. 922 (Bankr. E.D. Mich. 1998) and *In re Perviz*, 302 B.R. 357 (Bankr. N.D. Ohio 2000).  In *Borowski*, Bankruptcy Judge Rhodes noted support for the allowance of punitive damages for a violation of the permanent discharge injunction in circumstances where the conduct evidenced malevolent intent and a clear disregard and disrespect of the bankruptcy laws.  *Borowski*, 216 B.R. at 925.  Similarly, in *Perviz*, the Court reasoned that Congress intended some inherent power to punish parties for contemptuous violations of the discharge injunction through the imposition of punitive damages.  In support, the *Perviz* court recounted the explanation in *Walker v. M & M Dodge, Inc. (In re Walker)*, 180 B.R. 834 (Bankr. W.D. La. 1995) as follows:

> "[T]his Court does not believe that Congress would enact § 524 and not empower bankruptcy courts to dissuade invidious creditors from conduct violative of a clear congressional prohibition.  To do so would be nothing more than an exercise in legislative futility."

*Perviz*, 302 B.R. at 372 (quoting *Walker*, 180 B.R. at 849).  The *Perviz* court carefully weighed the admonition of the Supreme Court with respect to punitive damage due process issues and limited its $8,000 punitive damages award accordingly.  *Id.* at 374.  Significantly, that court

noted a deterrence factor, admonishing the creditor that if further violations occurred, it would

increase the noncompensatory damage award:

> In making this award, however, the Court also gives this warning:  If Ocwen
> should appear on a matter that, like in this case, involves a complete and utter
> disrespect for the automatic stay and/or the discharge injunction, this Court will
> not hesitate to impose punitive damages in ever increasing amounts until Ocwen
> feels it necessary to comply with the bankruptcy laws as promulgated by the
> Congress of the United States.

*Id*.  Finally, although not a class action, Debtors cite to *In re Haemmerle*, 529 B.R. 17 (Bankr.

E.D.N.Y. 2015) to illustrate one court's use of a formulaic approach to assess sanctions for

violation of the discharge injunction (assessing Wells Fargo $500 for each "knowing" discharge

violation).

There is much written on a bankruptcy court's authority to award non-compensatory

monetary damages (sometimes referred to as "punitive damages," sometimes as "sanctions").

The weight of the authorities may be generally summarized as follows:

1. Bankruptcy courts may sanction parties under their inherent authority and 11
   U.S.C. § 105.  *Chambers v. NASCO, Inc*., 501 U.S. 32, 46 (1991); *Mapother
   & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 477 (6th Cir.
   1996) (bankruptcy courts, like Article III courts, enjoy inherent power to
   sanction parties for improper conduct).

2. Contemptuous conduct which occurs in court can be "immediately adjudged
   and sanctioned summarily."  *Int'l Union, United Mine Workers of Am. v.
   Bagwell*, 512 U.S. 821, 826, n.2 (1994).

3. Contempt which is committed outside the presence of the court, including the
   failure or refusal of a party to obey a court order may be classified as either
   civil or criminal contempt.  Using contempt to punish is generally viewed as
   criminal, not civil.  *See Int'l Union, United Mine Workers of Am.*, 512 U.S. at
   827-28 ("a contempt sanction is considered civil if it 'is remedial, and for the
   benefit of the complainant.  But if it is for criminal contempt the sentence is
   punitive, to vindicate the authority of the court.'" (quoting *Gompers v. Bucks
   Stove & Range Co.*, 221 U.S. 418, 441 (1911))); *United States v. Aleo*, 681
   F.3d 290, 309 (6th Cir. 2012) (Sutton, J., concurring) (civil contempt is
   coercive or compensatory, "while criminal contempt is 'imposed for punitive
   purposes' and does not 'serve to compensate an aggrieved party or coerce a
   future action.'" (quoting *In re Chandler*, 906 F.2d 248, 249 (6th Cir. 1990))).

4.  If the contempt is criminal, penalties may not be imposed without affording
    the protections that the Constitution requires of criminal proceedings. *Young
    v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 790 (1987)
    ("counsel for a party that is the beneficiary of a court order may not be
    appointed to undertake contempt prosecutions for alleged violations of that
    order.").

5.  If the contempt is civil, penalties may include actual damages and coercive
    penalties.  Civil contempt has "a compensatory function and a coercive
    function." *Consol. Rail Corp. v. Yashinsky*, 170 F.3d 591, 596 (6th Cir.
    1999).  Civil contempt sanctions can compensate the party harmed by the
    contemnor's contempt; they can also "seek to cajole the party in contempt to
    act in the manner desired by the court." *Id.*

Here, Debtors' request for attorney's fees, which would compensate Debtors and the

subclass for the expenses Respondents' conduct has caused, and their request for a contingent

coercive sanction, which would be assessed for as long as Respondents continued not to comply

with the Court's discharge orders, are clearly appropriate civil contempt penalties.  To the extent

Debtors' self-styled request for punitive damages constitutes criminal contempt, class counsel

could not prosecute that request.  However, the Court retains inherent sanction powers to fashion

appropriate and limited remedies for improper conduct necessary to enforce the Bankruptcy

Code in accordance with the analyses in *John Richards*, *Borowski*, and *Perviz*, *supra*, which the

Court finds persuasive.

Respondents also claim that because Debtors have waived individual actual damage

claims, the Court may not consider punitive damages on a class basis.  They cite to several non-

bankruptcy/non-contempt class action cases which denied certification of punitive damages

claims where predicate individual compensatory damages were not determined.  These cases are

not persuasive in the contempt context before this Court.  For example, in *Johnson v. Nextel

Commc'ns, Inc.*, 780 F.3d 128, 148-50 (2nd Cir. 2015), the court addressed concern with the

class plaintiffs' trial plan which proposed that a jury determine a lump sum punitive damages

award for the entire class prior to determining individual injuries, and thereafter, extrapolating a

punitive damages ratio to be applied to individual awards. *Johnson* involved a putative class action against the putative class members' law firm and employer, asserting various claims arising from the defendants' actions in prior employment discrimination litigation. The relief sought in *Johnson* is distinguishable from this case. Here punitive sanctions, if any, will not be predicated on the amount of individual compensatory awards. Rather, any such sanctions will be mild, tethered to the egregiousness of the contemptuous conduct, and appropriate to enforce the Bankruptcy Code.

As a matter of law, the Debtors are not precluded from seeking mild non-compensatory monetary damages as sanctions for a discharge violation.

### b. *Predominance*.

Against this background, the Court turns to whether common questions in the Billing-Statement subclass predominate over individual questions. "[T]he focus of the predominance inquiry under Rule 23(b)(3)" is whether "a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1196 (2013) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). "When adjudication of questions of liability common to the class will achieve economies of time and expense, the predominance standard is generally satisfied." *Whirlpool,* 722 F.3d at 860 (alteration omitted) (internal quotation marks omitted).

Here, common questions easily predominate over individual ones. Whether Respondents' Billing Statements violate the discharge injunction is a common question to the subclass. Whether Respondents intentionally sent those statements is a common question to the subclass; Respondents concede that the mail subclass members received was in each instance a result of human mail coding decisions. There are no individual damages questions; the only damages that Debtors seek and the Court can certify are the subclass's request for (i) attorneys'

fees, (ii) a coercive sanction contingent on whether Respondents come into compliance with the

Court's interpretation of the discharge injunction, and (iii) mild non-compensatory damages.

The sole individual issues that remain are extremely manageable individual defenses–whether a

subclass member reaffirmed his debt to Respondents, or requested statements.  Both are a matter

of record, the former a matter of subclass members' bankruptcy records, and the latter a matter of

Respondents' internal records, which document customers' requests for statements.  The Court

finds that the predominance requirement of Rule 23(b)(3) is satisfied.

     *c.  Superiority.*

     Rule 23(b)(3) also requires courts to consider whether a class proceeding "is superior to

other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P.

23(b)(3).  Rule 23(b)(3) specifically directs courts to consider the following factors in assessing

whether class treatment is superior:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

*Id*.  The last three of these factors clearly weigh in favor of a superiority finding for the Billing-

Statement subclass.  No subclass member is involved in pending litigation with Respondents

except for Debtors themselves.  This Court is the only forum in which the subclass members'

contempt claims can be litigated.  The difficulties in managing the class proceeding should be

few, as it involves a relatively small number of claims, easily provable facts, and several legal

issues that are common to the subclass.

As to subclass members' interests in individually controlling their actions, courts typically hold that, in small claims cases, the benefits of class proceedings outweigh those interests, given the limited incentives to bring low-value claims.  As the Sixth Circuit has explained, "'the policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'"  *Carroll v. United Compucred Collections, Inc.*, 399 F.3d 620, 625 (6th Cir. 2005) (quoting *Amchem*, 521 U.S. at 617); *see also Beattie*, 511 F.3d at 567 ("a small possible recovery would not encourage individuals to bring suit, thereby making a class action a superior mechanism for adjudicating this dispute."); *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich*, 271 F.R.D. 572 (N.D. Ohio 2010) (holding that a maximum recovery of $3.10 per class member did not vitiate superiority); *cf. Carroll*, 399 F.3d 620, 625 (6th Cir. 2005) (holding that a maximum recovery of $60 per class member did not vitiate superiority).  The Court covered much of this ground in *Biery II*, when it held that it would apply Bankruptcy Rule 7023 because class procedures were superior to individual procedures in the contempt context. Subclass members' interests in individually controlling their actions are further minimized by the Court's reservation of subclass members' rights to pursue actual damages in future litigation.

A class contempt action is unusual.  However, the class procedure enhances the opportunity for the Court to discover and remedy sweeping violations of its discharge orders— orders which constitute the primary relief awarded to debtors.  From a subclass member's perspective, a potential liability judgment in this action, with the opportunity to leverage that judgment into actual damages in future proceedings, is easily superior to a ruling that would leave that subclass member to his individual remedies.  The Court finds that a class proceeding is superior to available alternatives.

**D. Class Counsel.**

Debtors have also moved the Court to appoint Strauss Troy, Co., L.P.A., and Matthew

Sanning and Nicholas Nighswander as class counsel under Rule 23(g).  Respondents do not

oppose this request.  The Court has reviewed the declarations of Mr. Sparks (a shareholder of

Strauss Troy), Mr. Sanning, and Mr. Nighswander [ECF Nos. 121–123] and finds that proposed

class counsel satisfy the standard set forth in Rule 23(g).  The Court will grant Debtors' Motion

to Appoint Class Counsel.

## III.  CONCLUSION

Absent a meaningful disclaimer, a post-discharge Billing Statement is indistinguishable

from an attempt to collect a discharged debt as a personal liability.  Thus, the answer to whether

Respondents' Billing Statements violate the discharge is common to the subclass of debtors who

received those statements.  Likewise, the question of whether Respondents willfully sent regular

Billing Statements to the subclass–a necessary predicate to a contempt finding–will likely

generate an answer common to the subclass.  These common questions of liability predominate

over any remaining individual questions, and class treatment is superior to individual

adjudication of the subclass's low-value contempt claims.  Plaintiffs have satisfied numerosity,

typicality and adequacy.  Debtors' proposed Billing-Statement subclass satisfies the Rule 23(a)

and Rule 23(b)(3) requirements.  Thus, the Court will certify a subclass, under Rule 23(b)(3), of

discharged chapter 7 debtors who received Billing Statements from Respondents, during the

class period, in a form substantially similar to certain statements in the record.

In contrast, whether an Informational Statement violates a debtor's discharge would

depend on, among other factors, the precise content of its disclaimer, and whether the statement

served a valid informational purpose given the facts of an individual debtor's case.  These critical

factors vary across Debtors' proposed Informational-Statement subclass, and those variations

preclude class-wide adjudication of liability.

### ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Debtors' Motion for Class

Certification [ECF No. 119] is GRANTED in part and DENIED in part as follows:

1.    The Court finds that Debtors' Billing-Statement subclass satisfies the Rule 23(a)

prerequisites of numerosity, commonality, typicality, and adequacy, and satisfies the Rule

23(b)(3) requirements of predominance and superiority.  The Court certifies the following class

under Rule 23(b)(3):

> All persons with real estate loans administered by Beneficial Kentucky, Inc.,
> or HSBC Mortgage Services, Inc., who filed a Chapter 7 bankruptcy petition
> in the Eastern District of Kentucky which resulted in the entry of a discharge
> between September 16, 2008 and the present, and who received a statement
> substantially similar to the statements in the record at ECF Nos. 121-8
> and 148-1 after the discharge became effective.

2.    Debtors are hereby appointed as class representatives.

3.    Debtors' request to certify non-compensatory punitive sanction claims for class

treatment is GRANTED.

4.    The rights of absent class members to seek actual damages in subsequent

proceedings are PRESERVED.

5.    Debtors' request to certify the Informational-Statement subclass under Rule

23(b)(3) is DENIED.

6.    Debtors' request to certify the Billing-Statement and/or Informational-Statement

subclass under Rule 23(b)(2) is DENIED.

7.    Debtors' motion to appoint Strauss Troy Co. LPA, Matthew Sanning, and

Nicholas Nighswander as class counsel is GRANTED.

8.      This matter is set for a status conference at **11:00 a.m. on January 12, 2016, in**

**the United States Bankruptcy Court, Room #306, 35 West 5th Street, Covington, Kentucky**.

The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.



Signed By:
*Tracey N. Wise*
**Bankruptcy Judge**
**Dated: Friday, December 11, 2015**
**(tnw)**